Deborah Marie **COURTNEY**, Plaintiff,

v.

Albert N. **REMLER**, Devaul L. Henderson, Jr., Dwain E. Ball, Erling D. Speer, Bernie Hirsch, Bernie Slotin, Robert M. Crumley, James E. Wright, E.K. Van Winkle, Jr., d/b/a Hotel Investments, A Limited Partnership, Defendants.

Civ. A. No. 81–1156–1.

United States District Court,
D. South Carolina,
Charleston Division.

June 29, 1983.

Joel D. Bailey, Beaufort, S.C., for plaintiff.

John V. Esposito, Hilton Head Island, S.C., for defendants.

## ORDER

HAWKINS, District Judge.

This diversity action came on for trial before the court without a jury on February 22, 1983. The plaintiff was the victim of a brutal assault, robbery and rape while on her honeymoon on Hilton Head Island in Beaufort County, South Carolina. The incident occurred on October 1, 1979, while the plaintiff and her husband were spending the weekend at a motel owned by the defendants. The complaint alleged that the defendants negligently supervised and operated the motel in which the incident occurred, and such negligence was the proximate cause of the injuries, both physical and mental, sustained by the plaintiff.

The court, having heard all the evidence and having reviewed the briefs of counsel filed in this case, and having fully considered the applicable law, makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The plaintiff is a resident and citizen of the Town of Johnston, which is located in Edgefield County, South Carolina.

2. The individually named defendants are doing business as Hotel Investments, a limited partnership. The general partners are residents and citizens of the State of Georgia.

3. Hotel Investments, a Georgia Limited Partnership, was formed by Agreement and Certificate of Limited Partnership dated the 17th day of December, 1975. The purpose of this limited partnership was to own the land and improvements involved in this litigation.

4. Quality Management Co. was incorporated under the laws of the State of Georgia on the 13th day of February 1976, and was duly qualified to transact business in the State of South Carolina. The company was formed for the purpose of operating the motel in question.

5. Hotel Investments, as Owner, and Quality Management Co., as Operator, entered into an Agreement dated the 1st day of September 1978, and pursuant thereto, Quality Management Co. took control and possession of the entire property, including the motel operation of the Islander Inn. The Agreement, pursuant to its terms, terminated on the 28th day of February, 1979, and the Agreement was not renewed.

6. On October 1, 1979, the plaintiff was brutally assaulted and raped while she and her husband were spending their honeymoon on Hilton Head Island, South Carolina, and staying at the Islander Inn.

7. The plaintiff is a caucasian female born April 20, 1958. She grew up in a small-town, rural environment in Edgefield, South Carolina.

8. The plaintiff was married to Ronald H. Courtney on September 29, 1979, in Edgefield, South Carolina.

9. Ronald H. Courtney was a lifetime resident of Johnston, South Carolina. At the time of his marriage to the plaintiff, he was employed at a service station.

10. Prior to October 1, 1979, neither the plaintiff, nor her husband, nor any member of their respective families had been victims of a crime.

11. Criminal activity on Hilton Head Island had steadily increased each year since 1975.

12. There had been no assaults or any other crimes against any person occurring on the Islander Inn premises prior to the subject assault.

13. Although neither the plaintiff nor her husband had ever been to Hilton Head Island, they were aware of the reputation of the island as a luxury resort, but were

unaware of any criminal activity occurring there.

14. The plaintiff's husband had stayed in motels on several occasions, but the plaintiff had only been a guest in a motel on one or two other occasions during her life.

15. The motel in question was originally designed and the plans and specifications were prepared by Mr. Terry Keane, a licensed architect who had previously designed other motels. Mr. Keane was originally hired by "Islander Associates," the original developers of the project.

16. Islander Associates obtained a franchise for the motel from Quality Inns International, Inc. ("Quality Inns"). The plans and specifications were approved by Quality Inns.

17. While under construction, the property was conveyed by Islander Associates to Hotel Investments, defendants herein, who completed construction of the motel pursuant to said plans. During completion of construction by defendants, Quality Inns inspected and approved the property pursuant to its franchise agreement. Hotel Investments subsequently determined to terminate the franchise agreement and the motel began operating as the Islander Inn, which was its designation at the time of the attack upon the plaintiff.

18. The plaintiff and her husband arrived at the Islander Inn during the early morning hours of September 30, 1979. Upon checking in, they noticed a uniformed security guard at the reception desk.

19. The Islander Inn complex consisted of a main building housing the lobby, reception area, restaurant and lounge. There were four (4) outlying buildings containing guest rooms. Each of the buildings containing guest rooms was rectangular in shape, two (2) stories in height, and had front and rear access doors. In addition, each ground level room had access to the outside via a sliding glass door.

20. Each guest room building had a long hallway down the center of the building separating the rooms on either side. The access doors to each building were not locked. Each guest room had a door leading into the hallway, and the hallway had a two and one-half (2.5) foot recessed area containing the entranceways to two rooms with an exact duplicate thereof across the hall.

21. Above each guest room door was a fluorescent light which provided the illumination of the hallways and the ability to see through the "observation port" located within the room side of the door. In front of each fluorescent light was a wooden valance to reflect the light rays directly up and down.

22. The motel room (Room 220) in which the assault occurred, as all rooms, had a fire-rated steel entrance door with a steel door frame. The steel door frame was constructed with a solid metal doorstop which prevented the opening of the door by the insertion of any object between the doorstop and the balance of the frame.

23. The doors were equipped with a door-latch with an automatic locking device. The doors closed and locked automatically.

24. The doorknob on the door was a motel security type which required the use of a key to open the door from the hall. The exterior or hallway-side portion of the doorknob contained "security lips," a mechanism utilized to deter the possible picking of the lock. The interior or room-side portion of the doorknob contained a push button whereby, when engaged, the entire exterior locking mechanism of the doorknob was secured against the possible opening of the door with either a room key or an employee's master key. For emergency situations, the management did maintain an emergency key which could override this double locking mechanism.

25. The steel doors contained a separate "dead bolt" security lock which was activated by a latch on the interior or room side of the steel door. On the exterior of the door a "room number" plaque was secured to the door and concealed an aperture in the door that allowed the "dead bolt" to be released from the hallway.

26. The doors contained an "observation port" whereby a guest in the room could look through the same and identify a person knocking outside the door or attempting to gain entrance. This observation port contained optics providing for magnification and wide vision when looking from the inside to the outside.

27. The door was not equipped with a chain lock or safety chain.

28. The steel door did not have any warning or cautionary instructions reminding guests to keep their doors locked and not to open the door for a stranger.

29. The sliding glass door, which provided a second means of access to the outside, contained a locking mechanism which had to be locked manually from the interior. It was the policy of the management to have a sticker or decal affixed to the sliding glass door above the handle and locking mechanism warning all guests to keep doors locked for their protection. It was the further policy of management to have the maids, when cleaning a room, leave all drapes covering the sliding glass door halfway open to allow sunlight to enter the room, and, consequently, this warning decal could easily have been seen. The maids were also instructed by management to replace any decals that either wore off or were torn off.

30. Room 220, on the date and time complained of, also had a telephone located therein, which was in proper working order, with instructions on the phone indicating numbers to dial direct to the front desk, the manager, and other motel offices.

31. Quality Management Co. had a planned, on-going security system which included both "in-house" personnel, as well as the utilization of a private security patrolman.

32. On a twenty-four (24) hour basis, security was provided by "in-house" personnel, including specific staff members and a security conscious awareness program extending to all employees. Housekeeping employees were charged with the responsibility of cleaning guest rooms and checking to see that the rooms were in order.

33. Certain employees were permitted to reside in efficiency units located on the Islander Inn premises.

34. Exterior lighting on the premises originally consisted primarily of low level pathway lights. The main parking area was illuminated by high intensity mercury vapor lights. There were no exterior lights on the buildings themselves. In 1978, light poles were added around the perimeter of the premises and 150 watt light bulbs were used.

35. At the time of the rape incident, only Mr. Richard Kwaiser, the general manager of the motel, and Beverly Martin, his replacement as general manager, were assigned living quarters in the complex. Prior to the incident, as many as three to four people lived on the premises.

36. In addition to the employee security, a private security guard company, Preventor Security, was hired to provide extra security during nighttime hours. At the time of the incident, one Preventor Security uniformed guard was on duty from approximately 10:00 p.m. until 7:30 a.m.

37. Mr. Kwaiser began working in the motel business in 1972 when he was employed by the DeSoto Hilton in Savannah, Georgia. He underwent a company training program at that time. His primary functions were sales and securing conventions. In 1974, he was assigned to the Atlanta Hilton.

38. In 1975, Mr. Kwaiser joined the Hyatt Corporation and was assigned to the Hyatt Hotel on Hilton Head Island. His primary function initially was to book conventions into the hotel. He also began to perform management-on-duty functions and was acting manager at night and on weekends. In 1977, Mr. Kwaiser accepted employment at the defendants' motel.

39. Between 7:30 and 8:00 p.m. on October 1, 1979, the plaintiff and her husband were in their room, at which time they heard a knock at their motel door. Having been told by friends at their wedding that

they would visit them after they arrived on Hilton Head Island, the plaintiff's husband responded to the knock.

40. The plaintiff's husband received no response to his inquiry as to who was there and looked through the "observation port." Seeing no one, he opened the door.

41. Once the door was opened, two (2) black males, armed with pistols and wearing coverings over their heads, forced their way into the room. They bound and gagged the plaintiff and her husband, robbed them of their money, ransacked their luggage and room, and raped and assaulted the plaintiff.

## CONCLUSIONS OF LAW

This court has jurisdiction since the uncontroverted evidence is that the plaintiff is a resident and citizen of the State of South Carolina and the defendants are residents and citizens of a state other than South Carolina, and the matter in controversy exceeds the sum of $10,000. 28 U.S.C. § 1332.

As stated in the Findings of Fact, Hotel Investments entered into an Agreement dated the 1st day of September 1978, wherein control and supervision of the motel operations were passed to Quality Management Company. The company was formed for the purpose of operating the motel, and its shareholders consisted of the general partners of Hotel Investments. The Agreement designated Hotel Investments as the "Owner" and Quality Management Company as the "Operator" of the motel facilities.

Pursuant to the terms of the Agreement, Quality Management was granted the sole and exclusive right to supervise and direct the entire management and operation of the motel. The Agreement provided that Quality Management Company had the right to hire, promote, discharge and supervise the work of the staff of the property, and to supervise, through the General Manager, the hiring, promotion, discharge and work of all operating and service employees performing services in or about the property. The Agreement further provided, and the evidence showed, that all employees shall be on the payroll of Quality Management Company.

The named defendants contend, based on Quality Management's exclusive control of the premises, that if any negligence in supervision does exist, it should be attributed to Quality Management and not to the named defendants. The plaintiff argues, *inter alia,* that Quality Management is merely an agent of Hotel Investments, and, therefore, any negligent supervision on the part of Quality Management would be imputed to Hotel Investments as principal.

■ The term "agency" has been defined as a fiduciary relationship by which a party confides to another the management of some business to be transacted in the former's name or on his account, and by which such other assumes to do the business and render an account of it. 3 AM.JUR.2d *Agency* § 1 (1962). The American Law Institute states that agency is the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. RESTATEMENT (SECOND) OF AGENCY § 1 (1957). Before an agency relationship can exist, the principal must intend that the agent shall act for him, and the agent must intend to accept the authority and act on it, and the intention of the parties must find expression either in words or conduct between them. 3 AM.JUR.2d *Agency* § 17 (1962). The cornerstone of an agency relationship is the power of the principal to control the conduct of his agent. *Sharpe v. Bradley Lumber Co.,* 446 F.2d 152 (4th Cir.1971); *Burriss v. Texaco, Inc.,* 361 F.2d 169 (4th Cir.1966); *Vance Trucking Co. v. Canal Ins. Co.,* 249 F.Supp. 33 (D.S.C.1966).

■ Although the Agreement between Hotel Investments and Quality Management terminated on the 28th day of February 1979, and was not renewed thereafter, this court looks to the Agreement to determine the proper relationship between the two entities. There is no question that the parties operated pursuant to the Agreement

before it was terminated, and there is no evidence or indication that the relationship changed after the termination of the Agreement.

The Agreement executed by Hotel Investments and Quality Management Company specifically provided that the duties of Quality Management as Operator were "to supervise and direct the management and operation of the Property as the *agent* of the Owner." Article IV, p. 4 (emphasis added). In discussing the Operator's banking responsibilities, the Agreement instructed the Operator, "[a]s *agent* for Owner, to deposit in a banking institution . . . all monies furnished by Owner as working capital . . . ." Article IV, No. 10, p. 7 (emphasis added). In addition to these specific agency terms, throughout the Agreement the Operator is instructed to get the approval of the Owner before performing certain tasks.[1]

Based on the fact that the Agreement shows the intention of both parties to form an agency relationship, and Hotel Investments actual control over the operations of the motel, this court finds that Quality Management was the agent of Hotel Investments on October 1, 1979, and any negligence attributed to Quality Management will be imputed to Hotel Investments.

We now turn our attention to the plaintiff's allegations that the motel was unreasonably supervised and operated, and such unreasonableness was the proximate cause of plaintiff's injuries. In the presentation of her case, the plaintiff raised a spate of conditions that could give rise to negligent conduct including negligent design of the premises and guest buildings, inadequate locking and safety mechanisms on the guest room doors, failure to give cautionary warning to guests, inadequate lighting on exterior of buildings and within the guest building hallways, and inadequate security to protect guests from criminal activity. In response to these arguments, the defendants contend they breached no duty owed to the plaintiff since the motel premises were reasonably safe for guest occupancy and the intervening criminal acts of third persons were not reasonably foreseeable.

■ The traditional formula for the elements necessary to establish a negligence cause of action may be stated briefly as follows:

(1) A duty recognized by law, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks;

(2) A failure on the part of the actor to conform to the standard required;

(3) The breach of the duty must be the "proximate cause" of the injuries, and

(4) Actual loss or damage resulting to the interest of others.

Prosser, *Law of Torts* § 30 (4th ed. 1971); *Shipes v. Piggly Wiggly St. Andrews, Inc.,* 269 S.C. 479, 238 S.E.2d 167 (1977).

■ The first condition of the formula definitely exists. There can be no doubt that motel management owes to its guests a duty to conduct its business according to a certain standard of conduct. The standard of conduct required by law is that an innkeeper is under a duty to its guests to take reasonable action to protect them against unreasonable risk of physical harm. RESTATEMENT (SECOND) OF TORTS § 314 A (1965). Of course, the statement of the duty only begs the question. The real issue to be determined is whether the innkeeper, under the circumstances, has taken reasonable action to protect its guests. This issue is addressed in the second condition.

After establishing the existence of a duty, the plaintiff must next prove that the defendants breached their duty or failed to conform to the required standard. The defendants first contend that no duty was breached since the injuries to the plaintiff were caused by unforeseeable criminal acts of a third party.

---

1. Language such as "Operator will make no major policy changes not reflected in the Budget, without prior approval of Owner," "for Owner's approval" and "first approved by the Owner" crop up throughout the Agreement.

When criminal acts are the actual cause of another's injuries, an innkeeper is not automatically exonerated from allegations of negligence. An act or an omission may be deemed negligent conduct if the actor realizes or should realize that his conduct involves unreasonable risks of harm to another through the conduct of a third person which is intended to cause harm, even though such conduct of the third person is criminal. Restatement (Second) of Torts § 302 B (1965). The Reporter's Notes immediately following Section 302 B elaborates on this point of law as follows:

> e. There are, however, situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others. In general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him against such intentional misconduct .... The following are examples of such situations ....
>
> ....
>
> B. Where the actor stands in such a relation to the other that he is under a duty to protect him against such misconduct. Among such relations are those of carrier and passenger, *innkeeper and guest,* employer and employee, possessor of land and invitee, and bailee and bailor. (emphasis added).

Restatement (Second) of Torts § 302 B, Comment e(B) (1965).

The South Carolina Supreme Court has on numerous occasions addressed the problem where an actor stands in a special relationship with another requiring the actor to reasonably protect others from criminal activity.[2] *Munn v. Hardee's Food Systems, Inc.,* 274 S.C. 529, 266 S.E.2d 414 (1980); *Shipes v. Piggly Wiggly St. Andrews, Inc.,* 269 S.C. 479, 238 S.E.2d 167 (1977); *Green v. Atlanta & C. Air Line Ry. Co.,* 131 S.C.

124, 126 S.E. 441 (1925); *Carter v. Atlantic Coast Line R. Co.,* 109 S.C. 119, 95 S.E. 357 (1918). In *Shipes, supra,* the plaintiff had been shopping in the defendant's grocery store, and at approximately 7:30 he walked to his car in defendant's parking lot. He was then assaulted by several persons, none of them connected with Piggly Wiggly. Plaintiff brought suit alleging the defendant negligently failed to adequately light and supervise its parking lot, which negligence proximately caused plaintiff's injuries. The Court held that the defendant did not know or have reason to know of criminal attacks on its premise such as the one on the plaintiff. Thus, the defendant was not under a duty to protect against such attacks. 238 S.E.2d at 169. However, the Court cited approvingly the Tennessee case of *Cornpropst v. Sloan,* 528 S.W.2d 188 (Tenn.1975), which stated that if the owners of a shopping center knew or had reason to know of acts occurring or about to occur on its premises that posed imminent probability of harm to an invitee, a duty of reasonable care to protect against such act arises.

Based on the law stated above, the defendants in the present case argue they had no duty to protect their motel guests from criminal attacks since the assault and rape of October 1, 1979, could not be reasonably anticipated. The defendants argue that there had never been a crime against a person on the premises until the rape against the plaintiff, although vandalism incidents had been reported on a few occasions. On the other hand, there can be no question that crime had dramatically increased on Hilton Head Island over the four years preceding the rape attack. Even one of the defendants' witnesses, a County police officer, testified as to the dramatic increase in crime on the island. In addition, during the three month period immediately preceding the attack on the plaintiff, a rape was reported each month on Hilton Head Island, and there is no question that the Islander Inn manager, Mr. Kwaiser, was

---

**2.** Although the Supreme Court has never addressed this problem as it relates to the innkeeper-guest scenario, the law is analogous to the common carrier-passenger situation, employer-employee situation, and possessor of land-invitee situation, which the Court has addressed.

aware of these rapes. In fact, the Islander Inn added light poles around the perimeter of the premises after discussions about the other rape incidents. Presumably, the management added the lights to deter the type of criminal activity that was occurring elsewhere on the island.

■ The Islander Inn hired a private security guard in May 1979 to guard the premises during the hours of 10:30 p.m. to 7:00 a.m. According to Mr. Kwaiser, all employees were informed of the crime problems on the island and instructed how to react if confronted with a crime. These types of action by the Islander Inn is an indication of its awareness of the criminal activity on the island. The security guard was presumably hired to protect the guests from late night crimes. As evidenced by its own conduct, Islander Inn obviously foresaw the possibility of criminal attacks on its guests and made a determination to combat the attacks. Since the defendants knew or should have known the possibility of criminal acts on their guests, they had a duty to exercise reasonable care to protect against such acts arising.

■ An innkeeper is not the insurer of safety for his guests. Rather, he owes to his guest the duty of exercising reasonable care to maintain in a reasonably safe condition those parts of his premises which a guest may be expected to use. *Darter v. Greenville Community Hotel Corp.,* 301 F.2d 70 (4th Cir.1962); *Carson v. Squirrel Inn Corp.,* 298 F.Supp. 1040 (D.S.C.1969); *Wainwright v. Thomas,* 250 F.Supp. 963 (D.S.C.1966); *Hadden v. McLaughlin,* 237 F.Supp. 209 (E.D.S.C.1965). In the final analysis, the issue is whether, under all the circumstances, the innkeeper in this case provided for its guests reasonable protection against injuries from criminal acts. *See* RESTATEMENT (SECOND) OF TORTS §§ 343, 344 (1965).

■ It is important to keep in mind that although criminal activity on the Islander Inn premises was foreseeable, only minor vandalism had occurred in the past, and there had been no criminal acts committed against a person. This fact is important when considering the amount of protection the Inn must afford its guests. Although Hilton Head Island was considered by many a "high crime" area, the Islander Inn management obviously did a fine job of keeping the criminal element off its premises until the time of the rape on October 1, 1979. However, it would be incorrect for this court to say the mere fact of a rape is conclusive evidence that security at the Inn was unreasonable. To do such would be to hold the Inn as an insurer of its guests' safety.

Mr. Kwaiser was hired to manage the motel at Islander Inn's inception in 1977. Prior to becoming known as the Islander Inn in the spring of 1979, the Inn had a franchise with Quality Inns. The franchisor made monthly checks of the premises and gave suggestions to Mr. Kwaiser concerning more efficient operation of the motel. According to Mr. Kwaiser's testimony, the in-house security system was accepted by Quality Inns, and no other comments were made about security. There can be no doubt that armed guards in every building, twenty-four hours a day, would have provided the guests with more protection than the security system employed by Islander Inn. However, it must be remembered that the Inn's function was as a luxury-island motel, not a prison. In considering the reasonableness of the security, the court must take into account the purpose and function of the business.

Based on the lack of criminal activity on the premises in the past, one uniformed guard during the nighttime hours is reasonable security for a guest at the motel. The motel is relatively small with 190 total guest rooms. One trained guard could adequately patrol the premises. When the guard left at 7:30 a.m., security was turned over to the employees. Maid services would go in and out of all the buildings. The maintenance force was busy throughout the day doing various chores on the premises. Guests at the hotel were actively going in and out of their rooms and the restaurant area. The tennis facilities had a tennis pro throughout the day working on the premis-

es. A few employees were allowed living accommodations on the premises. Before retiring for the evening, Mr. Kwaiser would walk the premises to ensure everything was operating smoothly. Then the night guard would arrive. The entire security program was reasonable under all the circumstances.

The plaintiff also alleges the buildings were negligently designed. This claim is based on the fact that the guest room doors were recessed and this made it difficult for one looking through the "observation port" to see visitors outside the door. Also, the recessed doorways made lighting in the hall inadequate, giving a shadow-effect throughout the hallway. There was testimony from the building architect that the hallways were designed in this fashion to avoid the dreary effect of long, straight hallways. Quality Inns had approved the design originally. The same type of design is prevalent throughout the industry. The recessed doors do not obstruct the view through the "observation port" if the visitor is standing at the door. The only view that is obstructed is if someone knocks at the door and steps a few feet away from the door. That should caution the guest that something suspicious is happening. Therefore, the design of the building is reasonable.

The lighting in the hallways, although dim, was adequate. The exterior lighting consisted of high intensity mercury vapor lights in the parking lot, light poles with 150 watt light bulbs around the perimeter of the premises, and low level pathway lights throughout the premises. This lighting was adequate.

The plaintiff next alleges that the doors to the guest rooms did not provide adequate protection for the guests. The essence of this charge is the failure of the doors to be equipped with "safety chains" or "chain locks." The architect for the motel testified that safety chains were deliberately excluded because they hindered management's entry into a room in case of emer-

gencies. The doors had numerous locking and safety mechanisms which provided adequate protection for the guests. The dead bolt lock could be deactivated from the hallway by removing the room number plaque and inserting a finger, but this feature was intended to allow management easy access to the rooms in case of an emergency.[3] The guest room doors, with all their locking mechanisms, provided reasonable protection for the safety of the guests.

The plaintiff also alleges that failure to have any warning or cautionary signs in Room 220, as is customary in the industry, was unreasonable on the defendants' part. The testimony is disputed as to whether Room 220 actually had a warning sign in it at the time of the rape, but it is undisputed that the Islander Inn had a policy to place decals on the sliding glass doors warning all guests to lock their rooms for their protection. Furthermore, the maids were instructed to check every room to make sure everything was proper, and the curtains were drawn after a clean-up so that the absence of a decal could be easily noticed. The warning system or procedure was reasonable.

The Islander Inn, as a whole, was operated and supervised reasonably. The Inn obviously felt a need to protect its guests from criminal attacks by third persons, and measures were taken to ensure their safety. The measures were reasonable. The rape incident was a truly unfortunate and horrible experience, but the defendants cannot be held responsible. For this court to hold otherwise would be equivalent to making all motels the insurer of their guests' safety. Therefore, it is

ORDERED, that this action be dismissed.

---

**3.** There is no indication that the assailants knew the dead bolt lock could be deactivated from the hallway, and there is no question that

they did not actually deactivate the dead bolt lock.