Bridget MANAHAN, Plaintiff,

v.

NWA, a Delaware Corp., and its wholly-owned subsidiary, Mainline Travel, Inc., a Minnesota Corp., d/b/a MLT Vacations; Windsong Water Tours, Inc., a Virgin Islands Corp.; and Virgin Islands Yacht Harbor Inc., d/b/a Yacht Haven Hotel, a Virgin Islands Corp., Defendants.

Civ. No. 86–567.

District Court, Virgin Islands,
D. St. Thomas and St. John.

Jan. 10, 1991.

Corey L. Gordon, Robins, Kaplan, Miller & Ciresi, Minneapolis, MN, Peter A. Martin, Redstone, CO, for plaintiff.

Rodney E. Gould, Rubin, Hay & Gould, Framingham, MA, for defendants Mainline Travel, Inc.

James L. Hymes, III, St. Thomas, VI, for Virgin Islands Yacht Harbor, Inc.

GILES, District Judge, sitting by designation.

This matter is before the court on defendants' motion to dismiss, or in the alternative, for summary judgment. Oral argument was heard on October 17, 1991. For the reasons set forth below, this action is dismissed as to defendant NWA, and summary judgment is granted as to defendants MLT and Yacht Harbor and against plaintiff Manahan.

**FACTS**

In February, 1986, Bridget Manahan ("Manahan") and a friend came to St. Thomas on a vacation organized by MLT Vacations. One night, while walking on the public sidewalk from a restaurant in Havensight Mall, a short distance, back to the Yacht Haven Hotel where she was a guest, Manahan was assaulted by an unknown male who attempted to snatch her purse. She resisted. A struggle ensued. In the course of the struggle, she was hit in the face, apparently with a blunt object. An elderly man, apparently a local resident, came to her rescue and helped chase away the attacker who fled into the dark among scattered public housing units located on the same side of the street as the assault. Her purse was saved, but she suffered the loss of her left eye. Later, Manahan brought suit against MLT Vacations (Mainline Travel), its parent company, NWA, Windsong Water Tours, and the Yacht Haven Hotel claiming that their negligence was the proximate cause of her loss.

MLT Vacations organized tour vacations. Windsong Water Tours arranged and sold day trips as an independent company, and also acted as "groundhandler" for MLT in the Virgin Islands.[1] Windsong's agreement with MLT included an arrangement whereby MLT received a portion of the money Windsong made on the tours sold to MLT clients. Windsong also had an agreement with Yacht Haven Hotel such that when a Windsong representative was located in the hotel lobby that person would also act as hotel concierge.

Upon arrival in the St. Thomas airport, plaintiff was met by Nancy Whitehouse ("Whitehouse"), an employee of Windsong Water Tours, who stood with a sign that read "MLT", pursuant to Windsong's role as groundhandler for MLT. Whitehouse helped all the MLT passengers to locate their luggage and find taxicabs to their various hotels. In addition to meeting its clients at the airport, MLT also provided the new arrivals at their chosen hotels with a first day "briefing" about St. Thomas, including issues of safety. Whitehouse delivered such a briefing at the Yacht Haven Hotel, a meeting which plaintiff attended. Whitehouse told the group that St. Thomas has crime "like anywhere else" and that taxis should be used to get around the Island instead of walking. (Whitehouse Deposition, p. 17, lines 8–10; Hauth Deposition, p. 19, lines 10–20). Also at this meeting, Whitehouse promoted the tours offered by Windsong.

Around noon the next day, plaintiff and her friend saw Whitehouse in the hotel lobby, sitting near a sign that said "MLT". At that time, Whitehouse was acting as the hotel concierge. Plaintiff and her friend asked Whitehouse for advice on inexpensive restaurants. Whitehouse suggested the Delly Deck Restaurant in the Havensight Mall. Plaintiff contends, she specifically told them it was unnecessary to take a cab there and back, even at night, because the road was well-lit. (Manahan Deposition, p. 25, lines 9–12; Hauth Deposition, p. 28, lines 20–25 and p.

---

1. Windsong Water Tours is currently undergoing Chapter 7 bankruptcy proceedings in the Virgin Islands Bankruptcy Court.

29, lines 1–9). Whitehouse denies memory of the conversation, but says she would never advise walking in St. Thomas at night because that would be "bad advice." Two nights later, when walking back from the Delly Deck Restaurant in Havensight Mall, plaintiff suffered the assault and battery which resulted in her grievous loss.

## DISCUSSION

### I. The Motions to Dismiss

■ NWA is the parent company of MLT. Since there is no supportable claim against NWA, it is dismissed as a party to this suit. Defendants MLT and Yacht Harbor Hotel seek dismissal, or in the alternative, summary judgment. Their motions to dismiss are denied because plaintiff has successfully stated a claim upon which relief could be granted. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Sheppard v. American Dredging Co.,* 77 F.Supp. 73 (E.D.Pa.1948).

### II. Summary Judgment Standard

The standard for granting summary judgment is a stringent one, but it is not insurmountable. A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Products Co.,* 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir.1983). In deciding whether there is a disputed issue of material fact the court must view all doubt in favor of the nonmoving party. *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismd.,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be re-solved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

"[A] motion for summary judgment must be granted unless the party opposing the motion can produce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring) (citing *Anderson,* 477 U.S. 242, 106 S.Ct. 2505, and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Moreover, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Thus, even if the nonmovant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511.

### III. Plaintiff's Claims Against Yacht Harbor and MLT

Plaintiff advances several theories of liability sounding in negligence, related to breach of a duty to warn. All are predicated upon the same theme: Whitehouse's advice, to the effect that walking to and from the Delly Deck Restaurant was safe, was negligently given and was reasonably relied upon by plaintiff. Plaintiff contends that Whitehouse was an agent of MLT and of Yacht Haven Hotel at the time she gave this advice.

Although Whitehouse denies that she would have given such advice to plaintiff, for the purposes of this summary judgment motion, it must be assumed that she did give the advice attributed to her.[2] The crucial inqui-

---

2. Plaintiff also contends that Whitehouse's affirmative statement that such would have been "bad advice" is proof that Whitehouse had knowledge of specific criminal danger that existed in plaintiff walking to and from the Delly Deck Restaurant at night. This court, however, does not agree. During her deposition, White-house specifically explained why she believed she would never have given such advice:
   Q. Why would it have been risky?
   A. Well, it's night. It's a dark road if they are walking from Yacht Haven to the Haven Site Mall, and I think good common sense, at least on my part I would frown on it.

ry becomes then whether her doing so breached a duty owed to the plaintiff. For the reasons which follow, this court finds as a matter of law that regardless of Whitehouse's employment status at the time she gave the advice, the alleged statement was not negligence.

■ Under common law, an innkeeper is under a duty to its guests to take reasonable action to protect them against unreasonable risk of physical harm. RESTATEMENT (SECOND) OF TORTS § 314A (1965). However, such proprietor "is not bound to anticipate and guard against the unusual or abnormal, or against something which reasonable care, skill, or foresight could not have discovered or prevented." 40 AM.JUR. 2d, Hotels, Motels, and Restaurants § 111 (1968).

Most of the case law as to what constitutes "reasonable action" by innkeepers to protect against criminal attacks by third persons is related to examinations of security measures taken by hotels, such as locks, guards, and lighting conditions, rather than consideration of advice given by a hotel employee. See, e.g., *Courtney v. Remler*, 566 F.Supp. 1225 (D.S.C.1983), *aff'd* 745 F.2d 50 (4th Cir.1984); *Banks v. Hyatt Corp.*, 722 F.2d 214 (5th Cir.1984). However, the central factor in determining the reasonableness of an innkeeper's actions arguably would be the same, that is, the foreseeability of the crime.

In *Courtney v. Remler*, *supra*, a plaintiff was raped and robbed in her room at a Quality Inn motel on Hilton Head Island, South Carolina, after her husband responded to a knock at the door and opened it without inquiry or inspection. Although there was evidence that the crime rate on the Island had "dramatically increased" in the four years prior to the attack, the hotel itself had experienced only acts of minor vandalism. The court sitting without a jury found after trial that the hotel's security was reasonable in light of its experience with crime and that the manner in which this particular criminal attack was accomplished could not have been foreseen reasonably or protected against by the motel.

In *Banks v. Hyatt Corp.*, *supra*, the Fifth Circuit affirmed a lower court decision which held a hotel liable for the fatal shooting of one of its patrons. The shooting occurred within four feet of a glass door entrance to the hotel, located within a mall, and thirty feet from the curb of the public street which ran parallel to the hotel's entrance. Critical to the court's finding was the existence of incident reports, kept by the hotel security department, which revealed a large number of criminal attacks in the immediate vicinity of the hotel prior to the shooting in question. The hotel, by its own records, had knowledge of the strong possibility of criminal attack.[3] The court noted that under Louisiana law the duty to protect the plaintiff from criminal acts would not have arisen had such criminal acts been unforeseeable or unanticipated. 722 F.2d at 220.

The *Banks'* court also addressed the scope of the physical area in which an innkeeper can be held responsible for protecting its guests from harms committed by third persons. The Hyatt Hotel claimed that it had no duty to protect the plaintiff from assaults committed outside the property of the hotel. The court, however, rejected this argument. It held that the hotel could not avoid liability simply because its guest was injured on property not belonging to the hotel. A hotel cannot be held liable for "*any* harmful act occurring *any* place, [unless] the hotel 'could have discovered' the [anticipated] act and protected [its] guest 'by controlling the conduct of the tortfeasor or by giving adequate warning.'" *Id.* at 217. (emphasis added). However, "an inkeeper's duty of care to a guest extends to the environs of a hotel, that is, an area immediately outside of a hotel's entrance or an area that [can reasonably be] considered to be part of the entrance." *Id.* Therefore, the court held that the Hyatt

---

Q. Is that a dangerous area of St. Thomas?
A. No more dangerous than any area of St. Thomas.

**3.** In the three months preceding the plaintiff's killing, there were eleven armed robberies and five simple robberies that occurred within the immediate surroundings of the hotel. Also, since 1976, plaintiff was the second person shot and the fifth victim of an armed robbery at the hotel's entrance way. *Id.*

Hotel could be held liable for foreseeable harms occurring to its guests immediately in front of the hotel's entrance way.

■ The teaching of these several cases is that an innkeeper is not an insurer against all risk of injury to its guests, but is obligated only to take reasonable steps to minimize risks that are foreseeable to its guests when they are reasonably within its sphere of control. This court adopts that instructive approach.

■ In the instant case, the assault upon plaintiff occurred on the public streets of St. Thomas and not on the property of the Yacht Haven Hotel or on premises that it could control. It is undisputed that MLT provided a briefing for its clients at which time it warned its clients to take cabs at night because of crime in St. Thomas. This warning statement, of course, was not a commandment that travelers were forced to follow. Instead, it was a strong suggestion from the tour organizer that cabs should be utilized in order to maximize safety.

Even after receiving this warning, plaintiff solicited Whitehouse's advice about the advisability of walking to local area restaurants. Necessarily, she wished to weigh the danger of walking to and from a local restaurant at night against the cost or inconvenience of taking a taxi. Ultimately, plaintiff chose to walk to the Delly Deck Restaurant. She chose not to take a cab. That was her prerogative. She had already been advised in the official briefing that only she, the visitor, could maximize her safety, and that she could do this only by taking a cab.

Whitehouse stated that she believed the road was well-lit and safe for plaintiff and her friend to travel at night on foot. It is agreed that Whitehouse's statement could not reasonably be understood as a guarantee that crime in St. Thomas, about which plaintiff had been warned generally, could not occur in the area of Yacht Haven and Havensight. Then, what could Whitehouse's later statement reasonably mean? It could only mean that, as far as she knew, there had been no prior instances of physical attacks upon tourists or others who had traveled the route at night, or in the day, and that she did not know of any conditions that represented a specific danger to the plaintiff were she to walk to and from the restaurant.

Defendants have by affidavits and deposition evidence shown that they had no knowledge of prior criminal attacks on patrons or other persons within the immediate vicinity of Yacht Haven Hotel. Specifically, MLT has presented evidence that from 1983 through 1989 it sent 9,418 clients to St. Thomas, including 967 who stayed at the Yacht Haven Hotel and that only one—plaintiff—had been the victim of crime anywhere on the Island.

In contrast, plaintiff has failed to adduce evidence showing that either MLT or Yacht Haven Hotel had actual knowledge that any of its patrons, or any other tourist to St. Thomas, prior to this occurrence, had ever been a victim of violent crime in the immediate vicinity of where plaintiff had to walk. Nor, has plaintiff adduced evidence that there were crimes perpetrated against visitors in that area about which the Yacht Haven Hotel should have been aware through the exercise of ordinary care. Indeed, plaintiff has failed to adduce evidence of any specific crime having occurred against tourists or locals traveling the streets that plaintiff traversed on the night in question.[4]

---

4. Plaintiff refers to the deposition of John Olive, Director of Yacht Haven security, to show that the hotel had actual knowledge of prior incidents because of public housing near to the hotel. (John Olive Deposition, pp. 13–14) However, no material issues of fact are raised by the testimony. Simply because public housing exists nearby does not mean that a hotel has a duty to warn its patrons that criminal harm can befall them—if there have never been any prior criminal incidents connected to the public housing of a type threatening to patrons' safety.

Indeed, the "incidents" of trouble that the hotel had experienced, which Mr. Olive referred to, involved vehicles blocking garbage bins, boating couples smoking marijuana at the marina and skate boarders practicing their sport on the property. *Id.* None of these incidents is specifically connected to the public housing near the hotel.

Mr. Olive stated that some patrons of the hotel had reported ·that their rooms had been entered without their consent. These incidents were not connected to the public housing nor with any assaultive behavior. Therefore, one can not reasonably conclude, as a result of these incidents,

■ Plaintiff has entered into the record the anecdotal statements of Professor Daniel Kennedy, Police Corporal Algernon Allen, and Police Sergeant Calvin Todman characterizing a police zone which includes the Yacht Haven Hotel area as a "high crime" region. (Kennedy Affidavit ¶ 10(J); Allen Deposition, p. 6, lines 11–25, p. 7, lines 2–9; Todman Deposition, p. 7, lines 8–16). However, defendants had no legal duty to do a general survey of crime statistics in St. Thomas. *Wilson v. American Trans Air, Inc.,* 874 F.2d 386, 390 (7th Cir.1989). Therefore, this evidence does not create a basis for imputing a special responsibility to either MLT or Yacht Haven to warn their patrons about that which they cannot be shown to have actually known or to have had a duty to learn. Also, these witnesses' recollection of criminal incidents occurring prior to plaintiff's incident are nonexistent. Neither of them testified about any specific attacks upon tourists or others which occurred prior to the attack upon plaintiff.

■ Moreover, Officer Todman stated during his deposition that when he spoke of the "high crime" zone he really was referring to the entire Sector 3 reporting area, "the D–3 area," which includes the entire area from Fort Christian on towards Oswald Harris Court all the way to Frenchman's Bay. (Officer Todman's Deposition, pp. 17–18.) This police zone is not an area immediately surrounding the hotel or indeed limited to the area in which plaintiff was walking or was attacked. As a matter of law, therefore, it cannot be used as a reasonable sphere of crime knowledge from which a duty to warn could be derived. *Banks v. Hyatt Corp.,* 722 F.2d at 217.

Finally, much has been made by the parties of 14 C.F.R. § 380.32(x) (1988), which defendant MLT routinely includes in its contracts with clients. This contract provision does not shield MLT from its own liability, however, there is no evidence before the Court that plaintiff ever signed MLT's standard contract containing this clause. But again, the issue boils down to whether White-

that the hotel had notice of the possibility that its patrons could suffer direct criminal harassment or assault off the premises, and would therefore

house's act in giving the advice could support a finding of negligence on anyone's part. The court finds that, as a matter of law, it cannot.

Accordingly, the following is hereby **ORDERED**: Defendant NWA's motion to dismiss is **GRANTED**. Defendant Yacht Harbor's motion for summary judgment is **GRANTED**, and Defendant MLT's motion for summary judgment is **GRANTED**.

need to be forewarned about walking in the vicinity of the hotel.