

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-2004

# Fabend v. Rosewood Hotels

Precedential or Non-Precedential: Precedential

Docket No. 03-1119

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Fabend v. Rosewood Hotels" (2004). *2004 Decisions.* Paper 285.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/285

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT
_____

No. 03-1119
_____

RICHARD FABEND;
MARGARET FABEND,
            Appellants,

vs.

ROSEWOOD HOTELS AND
RESORTS, L.L.C.;
CANEEL BAY, INC; UNITED
STATES OF AMERICA,

vs.

ROSEWOOD HOTELS AND
RESORTS, L.L.C.;
CANEEL BAY, INC.,
            Third-Party Plaintiffs

vs.

UNITED STATES OF AMERICA
DEPARTMENT OF THE
INTERIOR, NATIONAL PARK
SERVICE,
            Third-Party Defendant.
_____

APPEAL FROM THE DISTRICT
COURT OF THE VIRGIN ISLANDS

(D.C. No. 99-cv-00155)
District Judge:  The Honorable
            Thomas K. Moore

_____

ARGUED December 9, 2003

BEFORE: NYGAARD, BECKER, and
STAPLETON, Circuit Judges.


(Filed September 9, 2004)
_____

Vincent A. Colianni, II, Esq. (Argued)
Colianni and Colianni
1138 King Street
Christiansted, St. Croix
USVI, 00820
     Counsel for Appellants


Matthew J. Duensing, Esq. (Argued)
Michael Fitzsimmons, Esq.
Stryker, Duensing, Casner & Dollison
Drakes Passage, 2nd Floor
P.O. Box 6785
Charlotte Amalie, St. Thomas
USVI, 00804
     Counsel for Appellees


_____

OPINION OF THE COURT
_____


N Y G A A R D ,   Circuit  Judge.

Richard and Margaret Fabend sued
Rosewood Hotels and Resorts, Caneel
Bay, Inc., and the United States
Department of Interior, National Park
Service after Richard was injured while
bodysurfing in the Virgin Islands.  Fabend

settled the claims against the United States, but proceeded in the District Court of the Virgin Islands against the remaining defendants. Fabend claims that the defendants had a duty to warn him of a dangerous shorebreak condition at the beach, which created a forceful wave that drove him into the sand and left him a quadriplegic. The District Court granted summary judgment for the appellees.

The District Court had jurisdiction over this diversity action under the Revised Organic Act, 48 U.S.C. § 1612(a), and 28 U.S.C. § 1332(a)(1). We have jurisdiction to review the summary judgment order pursuant to 28 U.S.C. § 1291, and exercise plenary review. *Blair v. Scott Specialty Gases*, 283 F.3d 595, 602-03 (3d Cir. 2002). Although we review the facts in the light most favorable to Fabend, the central issue, whether appellees had a duty to warn or protect him, is a question of law. *Turbe v. Gov't of the Virgin Islands*, 938 F.2d 427, 429 (3d Cir. 1991) ("The nature of the legal duty owed by a defendant is generally a question of law.") (citing Restatement (Second) of Torts § 328B(b) (1965)). We hold that the appellees did not exercise sufficient control over the beach to create a duty to warn and will affirm.

I.

Cinnamon Bay beach on St. John, U.S. Virgin Islands is owned by the United States and is part of the Virgin Islands National Park. The Fabends were staying at the Cinnamon Bay Campground, which was owned by Caneel Bay, Inc. and operated by Rosewood Hotels and Resorts. Rosewood and Caneel had a limited and non-exclusive right to operate a campground and related services on national park land adjacent to Cinnamon Bay beach, pursuant to a series of concession agreements between Caneel and the National Park Service. Rosewood also rented cabins and operated a restaurant, beach store, and watersports center.

The relationship between Rosewood and the National Park Service was governed by a Concession Contract, a Concessions Operational Plan, and an additional Operating Plan. Under the terms of these documents, the National Park Service retained full access to the area adjacent to Cinnamon Bay beach, including the right to enter the area at any time; final authority over Rosewood's operations, such as the rates charged and the dates and hours of campground operation; and the responsibility for providing protection services for beach visitors, including law enforcement, safety inspections, and lifeguard functions. S.A. at 40-58, 101-09, 114-21. The National Park Service has acknowledged that it maintained physical control over all beaches and waters of the Virgin Islands National Park, including Cinnamon Bay beach. The National Park Service also produced signs and brochures to warn visitors of dangerous conditions within the park.

Although the factual accounts offered by the District Court and the two parties vary in some respects, none of these

differences is germane to our decision. According to his deposition, Fabend was heading back into the ocean from a successful "bodysurf" when he saw a particularly large wave coming at him. He decided it was too large to bodysurf and attempted instead to dive through it. When he tried to do this, the wave hit him and smashed him headfirst into the sand, breaking his neck.

Fabend claims the accident occurred because of a dangerous shorebreak condition off of Cinnamon Bay beach.[1] A shorebreak exists where the water rapidly becomes shallow as it approaches the shore, resulting in waves that can break with tremendous force and drive swimmers into the sand. Fabend contends that the potential danger of a shorebreak is not observable by the casual and uninformed swimmer.

## II.

The American Law Institute's Restatement of Law provides the rules of decision for the Virgin Islands "in the absence of local laws to the contrary." 1 V.I.C. § 4. Because there are no applicable local laws to the contrary, we apply The Restatement (Second) of Torts. The general rule is that one owes no duty to protect, and thus no duty to warn, another, even if one realizes that the other is at risk of injury. Restatement (Second) of Torts § 314. There are, however, special relationships that can give rise to such a duty. The only special relationships on which Fabend relies as giving rise to a duty to protect are those that exist between an innkeeper and his guests and between a possessor of land who holds it open to the public and members of the public who respond to the invitation.

Section 314A of the Restatement (Second) of Torts provides in relevant part:

(1) A common carrier is under a duty to its passengers to take reasonable action

(a) to protect them against unreasonable risk of physical harm . . .

(2) An innkeeper is under a similar duty to his guests.

(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

*Id.* Comment c to § 314A further provides:

The rules stated in this Section apply only where the relation exists between the parties, and the risk of harm, or of further harm, arises in the course of that relation. A carrier is under no duty to one who has left the vehicle and ceased to be a passenger, nor is an innkeeper

---

[1] Fabend and his expert witness claim that many Cinnamon Bay beach guests have fallen victim to this shorebreak and received serious injuries, although they only specifically mention and document one such injury.

under a duty to a guest who is injured or endangered while he is away from the premises. Nor is a possessor of land under any such duty to one who has ceased to be an invitee.

*Id.*

As Comment c makes clear, the duty to protect, and hence the duty to warn, exists only where the risk arises from the relationship, and it is not alone sufficient that a guest is exposed to a risk during the period he remains such. People undoubtedly come to Cinnamon Bay Campground to engage in numerous recreational activities on St. John and the surrounding waters – hiking, sailing, deep sea fishing, snorkeling, and sunbathing, as well as body surfing. This does not mean, however, that Caneel and Rosewood have a duty to warn guests of all of the non-obvious risks associated with these activities. A risk arises in the course of the relationship only if it occurs on the relevant premises. *Id.*

Our inquiry into whether appellees had a duty to warn Fabend of the shorebreak condition begins with the question of whether Cinnamon Bay beach and the adjacent bay should be considered part of the "premises" of the campground. To answer this question, courts have applied the "sphere of control" concept to determine whether a duty exists in various types of innkeeper liability cases. In *Banks v. Hyatt Corp.,* 722 F.2d 214 (5th Cir. 1984), for example, the Fifth Circuit Court of Appeals applied a sphere of control test when considering whether a

hotel owed a duty to protect a patron from a criminal assault by a third party when the patron was just outside the entrance doors to the hotel on a public sidewalk. *Id*. at 215. The hotel's security department had been made aware of reports of a number of incidents at the entrance, and the owner of the property had also received a recommendation to station a guard at the entrance. *Id*. at 218-19. The property owner contracted with the hotel to hire men for the purpose of adopting new security measures in areas outside the hotel's premises, including the area where the decedent was killed. *Id*. at 219. When the decedent's wife and children sued for wrongful death, the court concluded that the hotel's power to take security measures put it in sufficient control of the entrance to impose a duty on it to take reasonable measures to protect its guests from harm and/or to warn them of dangerous conditions.

Although *Banks* involves the death of a guest from the actions of a third party, it nonetheless states a principle that is relevant to the question before us, which it calls the "sphere of control" test. That is to say, when an innkeeper possesses or exercises sufficient control over the property adjacent to his premises, he has the power to take protective measures to reduce the risk of injury on that property. Having such power, the innkeeper has a duty to exercise it to the benefit of his patrons.

The specific factual setting of a case will ultimately dictate whether a party is in the position to control or has the power to

4

control land adjacent to his property such that a duty to protect or warn arises. *See id*. at 227. The "sphere of control" test requires that we look at the circumstances of the case to ascertain whether sufficient control exists over the adjacent premises. Relevant indicia of control include who is responsible for the safety of guests, who has the authority to dictate who may use the property, and whether the guests were invited by the property owners to use the adjacent land. *See Pacheco v. United States*, 220 F.3d 1126, 1131-32 (9th Cir. 2000). If, for example, an innkeeper leases property to operate a hotel, but the government retains control over the land for the use of general public, the innkeeper must only warn guests of dangers on the leased property and the ingress or egress therefrom. *See Stedman v. Spiros*, 161 N.E. 2d 590 (Ill. App. 1959), *cited in Banks*, 722 F.2d at 223-24; *see also Jones v. Halekulani Hotel, Inc.*, 557 F.2d 1308, 1311 (9th Cir. 1977) (finding that a hotel had no duty to protect someone who was injured diving from a seawall owned by the hotel but used as a public easement "[b]ecause the hotel had no right to control the use of the public thoroughfare . . . [and] [i]t is inequitable to impose a duty of maintenance on one without authority to control use").

Though we have never explicitly adopted the *Banks* test, the District Court of the Virgin Islands followed it in an earlier case, which we affirmed without opinion. *See Manahan v. NWA*, 821 F. Supp. 1105, 1108-09 (D.V.I. 1992) (*affirmed without opinion at* 1993 U.S. App. LEXIS 14348 (3d Cir. 1993)). The *Manahan* Court adopted the position that "an innkeeper is not an insurer against all risk of injury to its guests, but is obligated only to take reasonable steps to minimize risks that are foreseeable to its guests when they are reasonably within its *sphere of control*." 821 F. Supp. at 1109 (emphasis added).

We have, however, used a standard similar to "sphere of control" in cases involving railroad-related injuries. For example, in *Estate of Zimmerman v. SEPTA*, we held that a defendant did not owe a duty of care to someone injured on railroad tracks that the defendant neither owned nor controlled, even though the defendant might have used the tracks. 168 F.3d 680, 685 (3d Cir. 1999). We held that "[t]he duty to protect against known dangerous conditions falls upon the possessor of the land." *Id.* at 684. Quoting the Restatement, we defined a "possessor" of land as someone who "occupies the land with the intent to control it." *Id.*

Consistent with the approach taken in *Banks, Manahan,* and *Zimmerman*, we hold that defendants only had a duty to warn Fabend if the beach and the adjacent bay were under their "sphere of control." The beach was within their "sphere of control" if they had the legal right to control the conditions and use of the area, or possessed the area and evidenced an intent to control it even absent clear legal authority. In conducting this inquiry, we consider who had the legal authority to control the area, including the right to control access, establish rules for use, and

mitigate or warn of any dangerous conditions. We also consider the *de facto* control the defendants exercised over the area, and whether these actions were consistent with the terms of the legal relationship that placed control with the National Park Service.

### III.

It is undisputed that the park, including the swimming area, was owned by the federal government, and that the National Park Service had the right to exercise exclusive control over activity in that area. While the National Park Service had granted a license to Caneel and Rosewood, that license was limited under the controlling documents to the operation of cabins and a campground, a gift shop, and a water sports shop at locations assigned by the National Park Service, subject to certain controls retained by the National Park Service. For present purposes, the critical fact is that the National Park Service, except to the extent of authorizing operation of a water sports shop, did not in those documents surrender any control of the beach to Caneel or Rosewood. It follows that Caneel and Rosewood had no actual authority to control the swimming area where Fabend was injured. The National Park Service retained that authority and exercised it by promulgating regulations governing activities there and, indeed, publishing warnings of risks to be found there.

Nevertheless, Fabend suggests that Caneel and Rosewood, despite their lack of authority to do so, assumed the responsibility of controlling activity in the

swimming area and that, accordingly, this area must be considered a part of their premises. The problem with this theory is that all of the conduct of Caneel and Rosewood is consistent with their limited license and there is no evidence from which a jury could find that they exercised control over the swimming area.[2]

We reject the idea that a jury might find that Caneel and Rosewood exercised joint control over the swimming area. Fabend asserts that the Appellee's *de facto* control is evidenced by the facts that (1) Appellees were allowed to post signs, (2) there was no National Park Service regulation prohibiting it from hiring a lifeguard, (3) Appellees had a "maintenance crew;" (4) Appellees provided "trash cans as a service to beach users as they would return to the campground;" (5) that Appellees' personnel would at times patrol the beach for campground security purposes, and that one of its employees acknowledged that he had "monitored and policed" the swimming area on occasion; (6) Appellees operated the only amenities on the beach; (7) Appellees exclude non-guests from the

---

[2.] At oral argument we asked the parties to indicate the portions of the record that bear on the issue of whether defendants would have been allowed to post signs warning of beach conditions. Regardless of whether defendants would have been allowed to post their own signs, however, the point remains that such signs were the legal responsibility of the National Park Service.

beach at times and (8) Appellees suggested in their advertising that the beach belongs to them.

There is no question that Caneel and Rosewood had *actual* authority to post signs necessary or appropriate to the operation of a campground and the water sport shop, but that is of no legal significance here. What is important is that there is no evidence that they ever posted a sign purporting to direct or control activities in the swimming area. Similarly, Rosewood had *actual* authority to have its personnel provide campground security,[3] as well as trash cans for its

guests returning there, and it is not surprising that it did so. None of this is probative, however, of whether Caneel and Rosewood in fact exercised control over the swimming area. The relevant documents do not grant control of the swimming area to Caneel or Rosewood and, indeed, they reserve that control to the National Park Service.[4] Accordingly, the absence of a regulation prohibiting Caneel or Rosewood from hiring a lifeguard is hardly surprising. The relevant fact is that there is no evidence suggesting that either ever asserted control by engaging the services of a lifeguard for the swimming area.

Rosewood's maintenance crew only maintained the facilities it was authorized to operate. The only significant testimony with respect to the clean up of the beach

---

[3] James Bartell, the campground manager at Cinnamon Bay Campground, testified with respect to security was as follows:

Q.. . . You said these were nighttime security [personnel]. Did you have any security personnel working during the day?
A. We didn't, no.
Q. Do you know what time they would come on in the evening?
A. Generally about five or six o'clock in the evening.
Q. Would they patrol the beach area as well as the area around the cottages?
A. Well, their main responsibility was for the area around the cottages. The cottages are permanent tents and our bare ground camping facility. When they would look out on the beach to see if there was anything out there, I'm sure
(continued...)

---

[3] (...continued)
that they would.
Q. Did they walk the beach as part of their security patrol?
A. I think they could have walked out onto the beach just as a precaution to make sure that, you know, our campground was safe.

App. IV at 191-92.

[4] The documents explicitly state that, consistent with 36 C.F.R. § 1.5, the National Park Service retains the power and responsibility to regulate its land for the safety of visitors, and to take action — such as beach closures, or use restrictions — to maintain that safety.

was the following testimony of Richard Metcalfe, who ran the water sports center.

Q. Where does he rake the leaves?

A. Well, the leaves come down, he rake right around the building to try to keep it clean so we don't stump our toes on the tree roots and stuff like that.

Q. Does he do any maintenance on the beach itself; that is, pick up any leaves, bottles or anything on the beach?

A. No, I don't believe he has ever done that.

Q. Have you?

Did you hear the question?

A. I don't believe he has ever done that.

Q. I said have you ever done it?

A. Yes.

Q. Does Devon Boulon ever clean up around the beach?

A. I don't believe he's ever done that either.

Q. How about the others who you employ?

A. No, I don't think they ever cleaned up on the beach.

S.A. at 80-81.[5]

---

The only evidence concerning Caneel and Rosewood personnel and the swimming area indicated that they would advise people renting boats of the National Park Service rule prohibiting the use of boats in the swimming area and would secure a commitment that that rule would be obeyed.[6] This would support a finding

---

[5.] (...continued)
beach at Cinnamon Bay. Mr. Varlack, however, did not claim to have observed Caneel or Rosewood personnel cleaning the beach, and his understanding of who had responsibility for doing so was based on inadmissible hearsay.

[6.] Mr. Metcalfe, for example, testified:

Q. Well, I am asking you whether once a guest rents a kayak or windsurfer or sailboat, do you monitor their activities when they are in the water? For example, if you see them going into the swimming area, do you advise them not to do that?

A. We explain it to them beforehand that park regulations state that no hard objects are allowed in the swimming area. We explain to them where the swimming area is, and then we have them sign-off on the sign-off release form that they don't go into that area. I don't have the enforcement capability.

Q. In the event that people do [wander] into the swim area, do you warn them off?

A. No. We would call the ranger

(continued...)

---

[5.] There is testimony from an NPS employee, Leon Varlack, that NPS did not have personnel assigned to clean the

(continued...)

8

that Caneel and Rosewood exercised control with regard to the equipment they leased pursuant to their authority to operate a water sports shop; it would not support a finding that Caneel or Rosewood exercised control over the swimming area. The relationship between Caneel and Rosewood and Fabend while he was swimming was no different from their relationship with their other guests when they were hiking, deep sea fishing, or swimming on the other side of St. John. Under the governing law, that relationship was insufficient to give rise to a duty to warn on their part.

The evidence Fabend points to as an indication that Rosewood and Caneel operated the only amenities on the beach is not probative on the relevant control issue. Fabend was not using *any* equipment at the time of his accident, much less any equipment purchased or rented from the appellees. Furthermore, Fabend's contention that defendants "rent the only cottages on the beach" is also misleading. The cottages are not on the beach, but on the campground property adjacent to the beach, and are part of the concession contract with the National Park Service. Similarly, the appellees do not "exclude non-guests from the beach," but merely shut the road to the campground to non-guests during nighttime hours as is required by the National Park Service. *See* 36 C.F.R. § 1.5. As the District Court observed, appellees do not attempt to control other methods of accessing the beach at night. In fact, by law they would be prevented from doing so. *See* 12 V.I.C. § 402 (guaranteeing public access to the shorelines of the Virgin Islands).

Fabend also asserts that the appellees made up rules for the beach, such as placing a ban on campfires, and enforced rules such as a ban on boats in the designated swimming area. But the record demonstrates that none of these rules are the appellees' rules: they are rules established by the National Park Service which appellees merely aided in enforcing.

Finally, Fabends' argument that appellees treat the beach as their property when they advertise "our . . . white sandy beach" in their brochures is unpersuasive. A common phrase does not create a legal duty. As the District Court observed, rhetoric does not establish control and ownership any more than does an invitation to enjoy "our gentle trade winds."

---

[6.](...continued)

if they would do something silly. Let the park take care of them.

\* \* \*

Q. Okay. Mr. Rabsatt testified that at times you even go out in your boat to inform guests that they were deviating and going into the swimming area. Is that true?

A. Yes, there have been times that I have gone out, not into the swimming area, because I can't take my boat into the swimming area, and I told people that the park said that they are not supposed to go in there. I reminded them but again it's really – there is nothing I can do about it.

S.A. at 77-78; 78-79.

9

Because the evidence establishes that the beach was not within appellees' sphere of control, we hold that they did not have a legal duty to warn swimmers of the shorebreak danger. As such, the appellees are not liable for the injuries Fabend suffered.

## IV.

For the above reasons, we will affirm the District Court's grant of summary judgment in favor of the appellees.